# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **EP-22-CR-00634-FM** |
| | § | |
| | § | |
| **ZULEY JACZEL MELENDREZ-** | § | |
| **MACHADO** | § | |

## ORDER FINDING 18 U.S.C. § 922(G)(1) CONSTITUTIONAL IN LIGHT OF *UNITED STATES V. RAHIMI* AND DENYING MOTION TO RECONSIDER

Before the court is "Defendant's Motion to Reconsider Court's Order Denying Defendant's Motion to Dismiss" ("Motion") [ECF No. 53], filed April 25, 2023, by Zuley Jaczel Melendrez-Machado ("Defendant"). After due consideration, the Motion is **DENIED**.

## I.    BACKGROUND

In April 2022, Defendant was stopped for secondary inspection while attempting to enter the United States from Mexico at the Paso Del Norte Port of Entry in El Paso, Texas.[1] Agents searched Defendant's vehicle, discovered a lockbox in the trunk, and asked Defendant what was inside, to which Defendant responded "that's my gun."[2] Defendant was arrested and a further search of the lockbox revealed an unloaded 9mm caliber pistol and ammunition.[3] Defendant waived his *Miranda* rights and agreed to answer questions without the presence of an attorney.[4] Defendant, who had three previous state felony convictions for theft of property worth less than

---

[1] "Criminal Complaint" 2, ECF No. 1, filed Apr. 20, 2022.

[2] *Id.*

[3] *Id.*

[4] *Id.*

$2,500, admitted to agents he knew he possessed the firearm and knew he was prohibited from possessing a firearm with a felony conviction.[5]

In May 2022, a grand jury returned an indictment charging Defendant with a violation of 18 U.S.C. § 922(g)(1), which prohibits knowingly possessing a firearm after being convicted of a felony.[6]

A month later, the Supreme Court in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen* altered the legal landscape surrounding the Second Amendment by instructing courts to look only to history when determining whether a firearm regulation constitutionally burdens one's Second Amendment right.[7] Defendant moved to dismiss the indictment, arguing *Bruen* rendered § 922(g)(1) unconstitutional both facially and as applied to him.[8] The court denied that motion, finding that prohibiting felons from possessing firearms is consistent with the nation's historical tradition of firearm regulation.[9] It found the Second Amendment was understood during the Founding era to be limited to virtuous citizens, citing several proposals from the Constitutional Convention as well as felony forfeiture laws as support.[10]

Subsequently, the Fifth Circuit in *United States v. Rahimi* struck down § 922(g)(8), which criminalizes possession of a firearm while under a domestic abuse restraining order, holding that law unconstitutional in light of *Bruen*.[11] Rahimi also considered, among many other things,

---

[5] *Id.* at 2-3.

[6] "Indictment" 1, ECF No. 10, filed May 18, 2022.

[7] *See New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, --- U.S. ----, 142 S. Ct. 2111, 2127 (2022).

[8] "Defendant's Motion to Dismiss Indictment" 1, ECF No. 24, filed Aug. 15, 2022.

[9] "Order Denying Motion to Dismiss Indictment" 6–13, ECF No. 32, entered Oct. 18, 2022.

[10] *Id.* at 9–11.

[11] *See United States v. Rahimi*, 61 F.4th 443, 448 (5th Cir. 2023).

Constitutional Convention proposals, but found them poor indicators "of the Nation's early understanding of the scope of the Second Amendment right" because "they were not enacted."[12]

Defendant now moves for reconsideration of his motion to dismiss the indictment, arguing *Rahimi* supports the conclusion that § 922(g)(1) is unconstitutional.[13]

## II.   **APPLICABLE LAW**

The Second Amendment to the United States Constitution states "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."[14]

In *District of Columbia v. Heller*, the Supreme Court held the Second Amendment confers "an individual right to keep and bear arms."[15] In so doing, the Court struck down a District of Columbia law that broadly prohibited possession of handguns. It nevertheless emphasized that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons," which are "presumptively lawful regulatory measures."[16] Following *Heller*, the Courts of Appeals "coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combine[d] history with means-end scrutiny."[17]

---

[12] *Id.* at 457.

[13] "Defendant's Motion to Reconsider Court's Order Denying Defendant's Motion to Dismiss" ("Mot.") 20, ECF No. 53, filed Apr. 25, 2023.

[14] U.S. CONST. amend. II.

[15] *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008).

[16] *Id.* at 626, 627 n. 26.

[17] *Bruen*, 142 S. Ct. at 2125.

The *Bruen* Court subsequently found this "one step too many."[18] It agreed that step one, "which demands a test rooted in the Second Amendment's text, as informed by history," was "broadly consistent with *Heller*."[19] But *Heller* did "not support applying means-end scrutiny in the Second Amendment context."[20] The Court then "reiterate[d] that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'"[21]

Informed by *Bruen*, the Fifth Circuit in *Rahimi* struck down § 922(g)(8), which criminalizes possession of a firearm while under a domestic abuse restraining order.[22] In so doing, the Court concluded three things. First, Mr. Rahimi—who was not a convicted felon but merely subject to an agreed restraining order entered in a civil proceeding—was "among 'the people' entitled to the Second Amendment's guarantees."[23] Second, the Court found the Second Amendment covered Mr. Rahimi's conduct, *i.e.*, possession of a pistol and rifle, and therefore presumptively protected his right to keep those weapons in his home.[24] Third, however, the Court concluded that none of the historical examples offered by the Government showed that § 922(g)(8)

---

[18] *Id.* at 2127.

[19] *Id.*

[20] *Id.*

[21] *Id.* at 2129–30.

[22] *Rahimi*, 61 F.4th at 450.

[23] *Id.* at 452–53.

[24] *Id.* at 454.

was consistent with historical traditions of firearm regulation.[25] For instance, the Court discounted colonial laws disarming certain "dangerous" groups of people, such as slaves, Native Americans, and those unwilling to take an oath of allegiance, because those groups may not have been considered part of "the people" protected by the Second Amendment to begin with.[26] The Court also dismissed proposals from the Constitutional Convention that sought to limit the Second Amendment to "peaceable," law-abiding citizens since those proposals were not enacted.[27]

## III.   **DISCUSSION**

In light of *Rahimi*, Defendant now moves the court to reconsider its prior denial of his motion to dismiss the indictment and find that § 922(g)(1) is unconstitutional on its face or at least as applied to him.[28] He argues first that, although he is a felon, he is among "the people" protected by the Second Amendment.[29] Second, not only did the Government fail to offer convincing evidence that § 922(g)(1) was consistent with historical traditions of firearm regulation, but in fact historical evidence shows that § 922(g)(1) is affirmatively *in*consistent with historical tradition.[30]

### A.   *"The People"*

Defendant asserts that felons are included as part of "the people" protected under the Second Amendment, arguing "a person's status as a felon is properly considered in the historical tradition inquiry and does not affect whether the person has a Second Amendment right."[31]

---

[25] *Id.* at 460.

[26] *Id.* at 457.

[27] *Id.* at 457.

[28] Mot. at 1.

[29] *Id.* at 9–13.

[30] *Id.* at 13–19.

[31] *Id.* at 11.

Admittedly, the *Rahimi* Court did not provide clear guidance on this point. On the one hand, *Rahimi* asserted "the Supreme Court has made clear that 'the Second Amendment right is exercised individually and belongs to all Americans.'"[32] However, the actual quote from *Heller* is: "We start therefore with a strong *presumption* that the Second Amendment right is exercised individually and belongs to all Americans."[33] *Heller* went on to address merely the first part of that presumption, *i.e.*, whether the Second Amendment protected a private individual right as opposed to a collective right connected to militia service, ultimately affirming the former.[34] Indeed, the Court cautioned that it did "not undertake an exhaustive historical analysis [] of the full scope of the Second Amendment" while also emphasizing that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons."[35]

The Court did not explain whether this reassurance was based on the notion that felons were not included in "the people" protected by the Second Amendment or the idea that felons were simply among those people from whom the right could lawfully be taken, a distinction with which subsequent courts have wrestled. Then-Judge Barrett summed up the issue thusly: "Some maintain that there are certain groups of people—for example, violent felons—who fall entirely outside the Second Amendment's scope. . . . Others maintain that all people have the right to keep and bear arms but that history and tradition support Congress's power to strip certain groups of that right. . . . These approaches will typically yield the same result; one uses history and tradition to identify

---

[32] *Rahimi*, 61 F.4th at 453 (quoting *Heller*, 554 U.S. at 581).

[33] *Heller*, 554 U.S. at 581 (emphasis added).

[34] *Id.* at 606–22.

[35] *Id.* at 626.

the scope of the right, and the other uses that same body of evidence to identify the scope of the legislature's power to take it away."[36]

In fact, the *Rahimi* Court quoted this exact passage as support for its interpretation of *Heller* and *Bruen* as "espous[ing] the second" approach.[37] In other words, *Rahimi* on the one hand asserted the Supreme Court unequivocally instructed that the Second Amendment belongs to "all Americans" while also implicitly acknowledging that the Supreme Court has not yet so concluded by quoting then-Judge Barrett's post-*Heller* analysis. Adding to the confusion, *Rahimi* determined that *Heller* and *Bruen* should be "read" as supporting the proposition that all Americans enjoy Second Amendment rights. Nevertheless, immediately thereafter, the Court concluded that Mr. Rahimi was included in "the people" protected by that amendment in part because, at the time he was charged under § 922(g)(8), he was merely subject to an agreed restraining order entered in a civil proceeding; he was not a convicted felon, which "would have excluded him."[38] Yet if all Americans enjoy the right, *i.e.*, if then-Judge Barrett's second approach is the correct analytical framework, then whether Mr. Rahimi was a felon would be irrelevant in determining whether he was part of "the people" covered by the Second Amendment.

In short, *Rahimi*'s discussion on this point is less than clear. However, because of its detailed invocation of then-Judge Barrett's dissent in *Kanter v. Barr*, *Rahimi* most strongly supports finding all Americans, regardless of their criminal background, are included in "the

---

[36] *See Kanter v. Barr*, 919 F.3d 437, 451–52 (7th Cir. 2019) (Barrett, J., dissenting) (internal citations omitted).

[37] *See Rahimi*, 61 F.4th at 451–52.

[38] *Id.* at 452.

people" protected by the Second Amendment. Whether the Government may deprive Defendant's

rights under that Amendment is therefore properly assessed under *Bruen*'s historical analysis.[39]

   *B.    Historical Analysis*

   Defendant argues the Government failed to meet its burden under *Bruen* to provide

convincing historical examples showing § 922(g)(1) is consistent with our traditions of firearm

regulation.[40] The court pauses here to make two important points. First, *Bruen* should not be read

to strictly require that courts base their historical analyses on government briefing; otherwise, one

court may find a law constitutional while another may find the same law unconstitutional based

simply on how well evidence was presented.[41] Such results would be untenable.

   Second, under *Bruen*, while contemporary laws addressing general societal problems that

have persisted since the eighteenth century should be "distinctly similar" to historical regulations,

those addressing "unprecedented societal concerns" need only be "relevantly similar."[42] Because

§ 922(g)(1) and its precursor addressed unprecedented rises in crime rates, organized crime,

gangster violence, and racketeering,[43] the "relevantly similar" standard applies.[44] That standard

---

[39] *See United States v. Banuelos*, --- F.Supp.3d ----, EP-22-CR-00903, 2022 WL 17752205, at *3 (W.D. Tex. Nov. 10, 2022) ("How [the defendant's] prior felony might impact his Second Amendment right to possess a firearm is more properly assessed under step two's historical tradition analysis.").

[40] Mot. at 8, 13–16.

[41] *United States v. Charles*, --- F.Supp.3d ----, MO:22-CR-00154, 2022 WL 4913900, at *9 (W.D. Tex. Oct. 3, 2022). To be sure, *Bruen*'s guidance on this point is unclear. On the one hand, it requires that *the government* "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. On the other hand, it provides that courts "are *entitled* to decide a case based on the historical record compiled by the parties," *id.* at 2130 n. 6 (emphasis added), not that they are required to do so.

[42] *Bruen*, 142 S. Ct. at 2131–32.

[43] *See* Conrad Kahn, *Challenging the Federal Prohibition on Gun Possession by Nonviolent Felons*, 55 S. TEX. L. REV. 113, 115–16 (2013) (discussing the Federal Firearms Act of 1938, a precursor to § 922(g)(1)); Jeffrey Giancana, *The "Scourge" of Armed Check Fraud: A Constitutional Framework for Prohibited Possessor Laws*, 51 U. MICH. J. L. REFORM 409, 416 (2018) (discussing the expansion of firearms prohibition to all felons in 1961).

[44] *See Banuelos*, 2022 WL 17752205, at *4.

requires only that § 922(g)(1) be supported by a "historical *analogue*, not a historical *twin*."[45] In assessing relevancy, courts are to ask *how* and *why* the law in question burdens the Second Amendment.[46] With that, the court turns to the historical record, asking whether § 922(g)(1) is "consistent with this Nation's historical tradition of firearm regulation" and considering first Defendant's argument on the matter.[47]

Defendant asserts that, beyond merely an absence of justifications *for* § 922(g)(1), there is "meaningful affirmative historical evidence" to the contrary, *i.e.*, that felons "were *required* to keep firearms at the founding."[48] According to his theory, the Second Amendment must protect "the pool of individuals from whom the militia would be drawn," and "felons were part of the militia pool."[49] He cites Act of May 8, 1792, which "exempted" some classes of people, but allegedly not felons.[50] That law, however, merely stated that "all persons who now are or may be hereafter exempted by the laws of the respective states, shall be and are hereby exempted from militia duty."[51] It did not exempt any identifiable demographic groups while neglecting to exempt felons. Therefore, it does not support the proposition that felons were necessarily part of the militia pool. Nor were militiamen necessarily required to maintain arms. On the contrary, some colonies,

---

[45] *Bruen*, 142 S. Ct. at 2132–33 (emphasis in original).

[46] *Id.*

[47] *See Bruen*, 142 S. Ct. at 2126.

[48] Mot. at 17 (emphasis added).

[49] *Id.* (citations and internal quotation marks omitted).

[50] *Id.* (citing Act of May 8, 1792, §§ 1–2, 1 Stat. 271).

[51] Act of May 8, 1792, § 2, 1 Stat. 271.

such as Virginia, disarmed individuals who refused to swear allegiance to the government while still requiring them "to attend militia trainings and run drills without weapons."[52]

Rather than argue that historical evidence cuts in favor of arming felons, most criticism of § 922(g)(1)'s constitutionality is based simply on a purported absence of on-point historical evidence. For example, scholars point out that "bans on convicts possessing firearms were unknown before World War I"[53] and that "no colonial or state law in eighteenth-century America formally restricted the ability of felons to own firearms."[54] However, although bans specifically on convicts or felons possessing firearms may not have existed until recently, *Bruen* does not require that § 922(g)(1) be supported by a historical twin but rather historical analogues. On that, courts and scholars have offered myriad examples, some more persuasive than others.

Perhaps the most frequently cited examples purporting to demonstrate a historical tradition of disarming people like felons are three proposals from the Constitutional Convention. One was a recommendation from New Hampshire that the Constitution "include a bill of rights providing 'Congress shall never disarm any citizen, unless such as are or have been in actual rebellion.'"[55] Another came from a minority of the Pennsylvania delegation, which proposed that "no law shall be passed for disarming the people or any of them unless for crimes committed, or real danger of public injury from individuals."[56] Finally, Samuel Adams proposed in the Massachusetts

---

[52] *Range v. Attorney General United States*, 53 F.4th 262, 279 (3d Cir. 2022), *vacated for rehearing en banc*, 56 F.4th 992 (3d Cir. 2023) (citation omitted).

[53] C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 708 (2009).

[54] Carlton F. W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1374–75 (2009).

[55] Don B. Kates, *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204, 222 (1983).

[56] *Id.*

Convention that the Constitution never be construed "to prevent the people of the United States who are peaceable citizens, from keeping their own arms."[57]

Some take issue with these sources as historical support for § 922(g)(1). The terms of New Hampshire's proposal, for example, were "significantly narrower than a broad disarmament of felons."[58] Adams' usage of "peaceable citizens," meanwhile, "might mean 'nonfelons,' but that reading is neither obvious nor required."[59] Again, however, *Bruen* calls only for identifying historical analogues here, not twins. At least with Adams' proposal, "peaceable" might be sufficiently akin to "law-abiding," which would rule out felons.

More critical, however, is the fact these proposals were not ratified. Nevertheless, some courts and scholars dispute this as a sticking point, asserting "the failure of the proposed amendments is properly attributed to a lack of support by Federalists, who were in the majority in some early ratifying states, for inclusion of a bill of rights as a whole."[60] Eventually, the Bill of Rights was included, and although "the Second Amendment as ratified did not explicitly limit the right to virtuous or peaceable persons or exclude felons, other scholars have suggested that no objection was made because the exclusions were understood."[61] Still, the *Rahimi* Court, which considered the proposals by the Pennsylvania minority and Adams, found those proposals "not reflective of the Nation's early understanding of the scope of the Second Amendment right"

---

[57] *Id.* at 224.

[58] Larson, *supra*, note 54 at 1374–75.

[59] *Id.*

[60] *United States v. Coombes*, --- F.Supp.3d ----, No. 22-CR-00189-GKF, 2022 WL 4367056, at *7 (N.D. Okla. Sept. 21, 2022) (citing Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms*, chs. 8–11 (updated ed. 2008)).

[61] *Id.* (citing Halbrook, *supra*, note 60 at 273).

precisely because "they were not enacted."[62] Therefore, although the proposals arguably indicate a "common if imprecise understanding at the Founding regarding the boundaries of a right to keep and bear arms,"[63] the court is compelled to follow Fifth Circuit guidance and will not continue to grant these proposals meaningful evidentiary weight.[64]

Another possible historical analogue to § 922(g)(1) is the English tradition whereby felons forfeited property, including firearms.[65] Under the doctrine of attainder, forfeiture was permanent for those also sentenced to death (*i.e.*, they could not inherit or devise property).[66] However, at least one scholar has argued that felons not convicted of a capital offense could theoretically repurchase personal property following their conviction and forfeiture.[67] Moreover, the doctrines of forfeiture and attainder "did not carry over to the United States in their strict English form."[68] Indeed, "the First Congress [] abolished forfeiture of estate as a punishment for felons."[69] Forfeiture and attainder are therefore poor analogues for § 922(g)(1).

Next up are ancient "going armed" laws, which "forbade carrying arms in an aggressive and terrifying manner."[70] Such laws originated in England and carried over to the colonies, with

---

[62] *Rahimi*, 61 F.4th at 457.

[63] Marshall, *supra*, note 53 at 713.

[64] *See* Order Denying Motion to Dismiss Indictment at 10–11.

[65] *See* Kates, *supra*, note 55 at 266.

[66] Marshall, *supra*, note 53 at 714–15.

[67] *See id.*

[68] *Id.* at 715.

[69] *Austin v. United States*, 509 U.S. 602, 613 (1993) (citing Act of Apr. 30, 1790, ch. 9, §24, 1 Stat. 117).

[70] *See* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 262 (2020).

Massachusetts, the Massachusetts Bay Colony, New Hampshire, Virginia, and North Carolina confiscating firearms from those who brandished their weapons in a terrorizing fashion.[71]

Colonial "going armed" laws are not sufficiently analogous to § 922(g)(1). First, although punishment was forfeiture of arms, offenders were not necessarily prohibited from repurchasing weapons in the future.[72] Moreover, as *Rahimi* points out, North Carolina's law did not even provide for forfeiture and Massachusetts and Virginia eventually dropped forfeiture as a penalty.[73] Second, offenders could sometime avoid forfeiting their arms by providing a "surety" in which they gave "full assurance to the public" that they will not commit any violence.[74] Finally, "going armed" laws merely prohibited *carrying* weapons in a certain manner, not possessing them.[75]

Yet another common historical justification for § 922(g)(1) is that the right to bear arms was tied to virtuous citizenry.[76] According to one oft-cited scholar:

> The philosophical tradition embraced by the Founders regarded the survival of popular government and republican institutions as wholly dependent upon the existence of a citizenry that was 'virtuous' in upholding that ancient privilege and obligation. In this philosophy, the ideal of republican virtue was the armed freeholder, upstanding, scrupulously honest, self-reliant and independent— defender of his family, home and property, and joined with his fellow citizens in the militia for the defense of their polity.[77]

---

[71] *Id.*; *Rahimi*, 61 F.4th at 457–58.

[72] Marshall, *supra*, note 53 at 716–17.

[73] *Rahimi*, 61 F.4th at 458.

[74] Marshall, *supra*, note 53 at 717.

[75] *See also id.* at 707 ("Before the fertile inter-war period, the overwhelming focus of gun regulation in the States (there was none from the Federal Government) was on *carrying* weapons, particularly through laws against carrying them concealed; state courts had essentially unanimously upheld such laws since they appeared in the early 1800s. States avoided the more extreme approach of banning *possession*.")

[76] Don B. Kates, *The Second Amendment: A Dialogue*, 49 L. & Contemp. Probs. 143, 146 (1986).

[77] Kates, *supra*, note 55 at 231–32.

Thus, virtue in this context "contemplated participation in governance, sublimating personal interests to the needs of the public."[78] "One implication of this emphasis on the virtuous citizen is that the right to arms does not preclude laws disarming the unvirtuous citizens (i.e., criminals)."[79]

However, while virtuousness may have informed the Founders' political philosophy, there is no legal or practical "tradition of disarming persons based on virtue."[80] Indeed, "[r]ecognizing the broad necessity of virtue in society is different than suggesting that people can be deprived of fundamental and natural individual rights merely because they lack virtue."[81]

Nevertheless, perhaps undergirded by something akin to a "virtuous citizen" theory, many colonial laws disarmed those considered disobedient, disaffected, or disloyal. Often, these laws took the form of loyalty tests whereby those unwilling to swear loyalty to the new state government were prohibited from owning firearms. For example, "[s]hortly after adopting their state constitution, which affirmed that 'the people have a right to bear arms for the defense of themselves and the state,' Pennsylvanians passed a series of Test Acts which imposed severe penalties on citizens who refused to take an oath of allegiance to the state. Individuals who refused to take the oath were disarmed."[82] Thus, as one scholar has concluded, the Pennsylvanian right to bear arms was a "civic right, one that was limited to those members of the polity who were deemed capable of exercising it in a virtuous manner."[83] In the mid-1700s, Maryland similarly disarmed "anyone

---

[78] Royce de R. Barondes, *The Odious Intellectual Company of Authority Restricting Second Amendment Rights to the "Virtuous"*, 25 Tex. Rev. L. & Pol. 245, 266 (2021).

[79] Kates, *supra*, note 75 at 146.

[80] Greenlee, *supra*, note 69 at 275.

[81] *Id.* at 285.

[82] Saul Cornell, *"Don't Know Much About History": the Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657, 670 (2002).

[83] *Id.* at 671.

who refused to take an oath of allegiance to King George III, while Virginia exempted from disarmament anyone willing to take such an oath."[84]

Numerous justifications have been given for such laws. Some argue they were based on concerns for public safety.[85] Others assert they were sought to prevent armed rebellion.[86] Massachusetts, for example, enacted a law in 1637 requiring "named individuals who expressed 'opinions & revelations' that 'seduced & led into dangerous errors many of the people' of New England to turn in all 'guns, pistols, swords, powder, shot, & match,' and it further barred them from 'buy[ing] or borrow[ing]' any of the same until such time as the local court said otherwise."[87]

Imminent concerns for public safety and armed rebellion, however, cannot account for the entire justification for such laws since lack of loyalty to a government does not make one likely to commit violence or rebel. Rather, loyalty laws may also have been motivated by the disarmament of groups who simply refused to conform to the dominant society. Following the English Civil War, the British monarchy disarmed non-Anglican Protestants out of concern they "would not obey the King and abide by the law," which in this case was synonymous with Anglican Protestantism.[88] In 1689, British Parliament disarmed Catholics likely because of "their perceived disrespect for and disobedience to the Crown and English law."[89] Similarly, Maryland, Virginia, and Pennsylvania disarmed Catholics in 1756 arguably "because the Protestant majorities in those

---

[84] Greenlee, *supra*, note 69 at 263.

[85] *Kanter*, 919 F.3d at 451 (Barrett, J., dissenting).

[86] Greenlee, *supra*, note 69 at 261.

[87] Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & Contemp. Probs. 55, 72 (2017).

[88] *Range*, 53 F.4th at 275 (citing Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 45 (1994)).

[89] *Id.* at 275.

colonies viewed Catholics as defying sovereign authority and communal values," not because they posed a uniform threat of violence or resistance.[90]

*Rahimi* found loyalty or oath laws poor historical analogues to § 922(g)(8) because their purpose for disarmament was "the preservation of political and social order, not the protection of an identified person from the threat of domestic gun abuse."[91] While this critique does not apply to § 922(g)(1), the Court also "question[ed]" whether disloyalty laws could even "present tenable analogues" under *Bruen* since they "may well have been targeted at groups excluded from the political community—i.e., written out of 'the people' altogether."[92] Accordingly, "[t]heir utility as historical analogues" was deemed "dubious, at best."[93]

The court is not persuaded that such laws are per se untenable historical analogues. For one, it is far from settled that those disarmed were considered outside the political community. It would be important to know, for example, whether disarmed individuals were also barred from voting or other political participation. Second, *Rahimi* did not definitively instruct district courts in the Fifth Circuit to disregard loyalty or oath laws when conducting a *Bruen* analysis. Instead, it simply "question[ed]" the viability of those laws, concluding they "may" be poor analogues.

Therefore, until it is convincingly shown that such laws targeted only those considered outside the political community, the court is free to consider whether loyalty laws were "relevantly similar" to § 922(g)(1). To reiterate, a "relevantly similar" regulation need only be a "historical

---

[90] *Id.* at 277.

[91] *Rahimi*, 61 F.4th at 457 (citation and internal quotation marks omitted).

[92] *Id.*

[93] *Id.*

*analogue*, not a historical *twin*."[94] Relevancy is based on *how* and *why* the law in question burdens the Second Amendment.[95] Loyalty laws fully disarmed certain groups (the *how*), just as § 922(g)(1) fully disarms felons. And although one could often get their guns back under loyalty laws by swearing allegiance to the government, expecting modern firearm laws like § 922(g)(1) to permit rearmament for felons who pinky-swear to obey the law going forward is unrealistic and would bind courts within the kind of "regulatory straightjacket" that *Bruen* disavowed.[96] As to the *why*, loyalty laws apparently were enacted at least in part because "disloyal" groups flouted the rule of law, defying sovereign authority and communal values. Section 922(g)(1) is no different: although public safety is certainly a priority when disarming certain felons, it cannot be the only priority since other felons—such as those convicted of regulatory crimes—are not inherently violent, dangerous, or threatening. Rather, their disarmament is most naturally justified by their failure to conform to the law.

Accordingly, the court finds loyalty laws sufficiently analogous to § 922(g)(1). Nevertheless, the court acknowledges that, in light of *Rahimi*, it is a close call. *Heller*'s continuing relevance, however, tips the scales in favor of finding § 922(g)(1) constitutional.

C.      Heller*'s Continuing Relevance*

*Bruen* essentially instructed lower courts to consider only history when assessing Second Amendment challenges and, in so doing, did away with the means-end test that circuit courts had developed.[97] However, circuit courts had also been applying textual and historical analyses

---

[94] *Bruen*, 142 S. Ct. at 2132–33 (emphasis in original).

[95] *Id.*

[96] *Id.* at 2133.

[97] *Id.* at 2127.

alongside means-end scrutiny.[98] Accordingly, many district courts in the wake of *Bruen* have found their respective circuit's Second Amendment jurisprudence only partially abrogated, rather than entirely overruled, to the extent it rested on a means-end analysis.[99] Saving from precedence what can be salvaged is a common, laudable practice.

The *Rahimi* Court, however, concluded *Bruen* so "fundamentally changed" the Fifth Circuit's Second Amendment jurisprudence that all its prior precedence is now "obsolete."[100] Therefore, this court cannot, as it would otherwise do, simply follow *United States v. Anderson*, in which the Fifth Circuit held § 922(g)(1) constitutional post-*Heller* without employing means-end scrutiny.[101]

Nevertheless, while the Fifth Circuit has declared its Second Amendment precedence extinct, *Heller* remains good law and continues to guide this court. In *Heller*, the Court noted that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons."[102]

Rather than follow *Heller*, however, Defendant argues the court should adopt the reasoning in now-Justice Barrett's dissent in *Kanter* and find § 922(g)(1) unconstitutional at least as applied to non-violent felons like himself.[103] It is persuasive and indicative, Defendant asserts, "[t]hat

---

[98] *See, e.g., United States v. McGinnis*, 956 F.3d 747, 753–54 (5th Cir. 2020), *overruling recognized by Rahimi*, 61 F.4th at 450–51.

[99] *See, e.g., Hanson v. D.C*, --- F.Supp.3d ----, No. 22-2256 (RC), 2023 WL 3019777, at *5 (D.D.C. Apr. 20, 2023); *United States v. Hill*, --- F.Supp.3d ----, No. 21cr107 WQH, 2022 WL 4361917, at *3 (S.D. Cal. Sept. 20, 2022); *United States v. Hammond*, --- F.Supp.3d ----, No. 4:22-cr-00177-SHL-HCA, 2023 WL 2319321, at *3 (S.D. Iowa Feb. 15, 2023).

[100] *Rahimi*, 61 F.4th at 450–51 (citation and internal quotation marks omitted).

[101] *See United States v. Anderson*, 559 F.3d 348, 352 (5th Cir. 2009).

[102] *Heller*, 554 U.S. at 626.

[103] Mot. at 19; *see Kanter*, 919 F.3d at 451–69 (Barrett, J., dissenting).

*Rahimi* cited favorably to this dissent, and Justice Barrett was in the majority in *Bruen*."[104] Defendant is incorrect.

First, the court cannot give a dissenting opinion from the Seventh Circuit greater weight than a majority opinion from the Supreme Court.

Second, *Rahimi* cited favorably to the *Kanter* dissent's conclusion that felons are included in "the people" protected by the Second Amendment.[105] It did not endorse then-Judge Barrett's doubt in *Kanter* that legislatures could "permanently deprive felons of the right to possess arms simply because of their status as felons."[106] In fact, *Rahimi* suggested the Founders would have tolerated disarmament of irresponsible, non-law-abiding citizens.[107] It also noted that Mr. Rahimi, who was merely "subject to an agreed domestic violence restraining order that was entered in a civil proceeding[,] . . . was not a convicted felon or otherwise subject to another longstanding prohibition on the possession of firearms that would have excluded him."[108]

Third, *Bruen* strongly supports the conclusion that prohibitions on the possession of firearms by felons remain constitutional as all nine justices took pains to leave *Heller* intact. Six justices cited favorably and explicitly to *Heller*'s reassurance, including Justice Alito's concurrence, Justice Kavanaugh's concurrence, to which Chief Justice Roberts joined, and Justice

---

[104] Mot. at 19 (internal citation omitted).

[105] *See Rahimi*, 61 F.4th at 451–53; *Kanter*, 919 F.3d at 451–53 (Barrett, J., dissenting).

[106] *See Kanter*, 919 F.3d at 454 (Barrett, J., dissenting).

[107] *See Rahimi*, 61 F.4th at 452 ("*Heller*'s reference to 'law-abiding, responsible' citizens meant to exclude from the Court's discussion groups that have historically been stripped of their Second Amendment rights, i.e., groups whose disarmament the Founders 'presumptively' tolerated or would have tolerated.").

[108] *Id.* (citation and internal quotation marks omitted) (cleaned up).

Breyer's dissent, joined by Justices Sotomayor and Kagan.[109] The majority opinion, meanwhile, emphasized that *Bruen* made "*more* explicit" the "constitutional standard endorsed in *Heller*," which reinforced prohibitions on firearms possession for felons.[110] Indeed, the majority consistently cabined its discussion of Second Amendment rights to "law-abiding" citizens, using that phrase at least ten times. For example, the Court began by reiterating the Second Amendment protects "the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense."[111] Indeed, it "elevates above all other interests the right of law-abiding, responsible citizens to use arms for self-defense."[112] The Court also explained that *Heller* requires district courts to determine how and why challenged regulations burden "a law-abiding citizen's right to armed self-defense."[113] Ultimately, the Court held the New York law at issue unconstitutional "in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms."[114] Justice Barrett's concurring opinion, meanwhile, made clear that she "join[ed] the Court's opinion in full."[115]

Undeterred, Defendant argues *Heller*'s non-binding dicta should be ignored, even in light of *Bruen*. As he points out, *Bruen* did not endorse *Heller*'s dicta "as historical fact. Nor did *Heller*

---

[109] *Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring), 2162 (Kavanaugh, J., concurring), 2189 (Breyer, J., dissenting).

[110] *Id.* at 2134 (emphasis added).

[111] *Id.* at 2122.

[112] *Id.* at 2131 (internal quotation marks omitted).

[113] *Id.* at 2132–33.

[114] *Id.* at 2156.

[115] *Id.* at 2162 (Barrett, J., concurring).

announce that [prohibitions on the possession of firearms by felons] would be categorically excepted from an historical analysis announced 15 years later in *Bruen*."[116]

Defendant's grievances are misplaced. First, the court has conducted a historical analysis; *Heller* is not being used to circumvent that requirement. Second, although *Heller*'s reassurance is dicta, "[c]ourts often limit the scope of their holdings," as in *Heller*, "and such limitations are integral to those holdings."[117] Moreover, Supreme Court dicta carry "special weight," to which "lower courts should ordinarily take a deferential position."[118] As the Fifth Circuit has explained, although it is not bound by even its own dicta, that "of the Supreme Court are, of course, another matter."[119] Other courts agree: "Supreme Court dicta have a weight that is greater than ordinary judicial dicta as prophecy of what that Court might hold."[120] This court therefore finds *Heller*'s dicta, affirmed by a majority of the Court in *Bruen*, instructive and persuasive enough to tip the scales in favor of continuing to find § 922(g)(1) constitutional.

### D.    As-Applied and Facial Challenges

Defendant asserts as-applied and facial challenges to § 922(g)(1). "When a litigant brings both as-applied and facial challenges," courts are to "decide the as-applied challenge first because it is the narrower consideration."[121] Both historical loyalty laws and *Heller* support the conclusion

---

[116] Mot. at 8.

[117] *United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010).

[118] *Hernandez v. United States*, 785 F.3d 117, 137 n. 6 (5th Cir. 2015) (Prado, J., concurring), *vacated and remanded*, *Hernandez v. Mesa*, 137 S. Ct. 291 (2016); *Sonnier v. Crain*, 613 F.3d 436, 464 (5th Cir. 2010) (Dennis, J., concurring in part and dissenting in part), *withdrawn in part on reh'g*, 634 F.3d 778 (5th Cir. 2011).

[119] *United States v. Becton*, 632 F.2d 1294, 1296 n. 3 (5th Cir. 1980).

[120] *United States v. Montero-Camargo*, 208 F.3d 1122, 1132 n. 17 (9th Cir. 2000) (citation and internal quotation marks omitted).

[121] *Buchanan v. Alexander*, 919 F.3d 847, 852 (5th Cir. 2019).

that felons may be disarmed, irrespective of whether their underlying crimes were violent. Therefore, § 922(g)(1) is constitutional as applied to Defendant, though he is a non-violent felon.

"To sustain a facial challenge, the challenger must establish that no set of circumstances exists under which the statute would be valid."[122] Having established that § 922(g)(1) is constitutional as applied to Defendant, his facial challenge also fails.

## IV. CONCLUSION

For the foregoing reasons, the court finds 18 U.S.C. § 922(g)(1) constitutional, even in light of *United States v. Rahimi*. In so doing, the court continues to concur with every other district court to have considered § 922(g)(1) in the wake of *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*.[123] Accordingly, it is **HEREBY ORDERED** that "Defendant's Motion to Reconsider Court's Order Denying Defendant's Motion to Dismiss" [ECF No. 53] is **DENIED**.

**SIGNED AND ENTERED** this 14th day of **June 2023.**

**FRANK MONTALVO**
**SENIOR UNITED STATES DISTRICT JUDGE**

---

[122] *McGinnis*, 956 F.3d at 752 (internal quotations and citation omitted) (cleaned up).

[123] *See, e.g., United States v. Butts*, --- F.Supp.3d ----, No. CR 22-33-M-DWM, 2022 WL 16553037, at *3 (D. Mont. Oct. 31, 2022); *United States v. Carrero*, --- F.Supp.3d ----, No. 2:22-cr-00030, 2022 WL 9348792, at *3 (D. Utah Oct. 14, 2022); *United States v. Charles*, --- F.Supp.3d ----, No. 22-CR-00154, 2022 WL 4913900, at *10 (W.D. Tex. Oct. 3, 2022); *United States v. Collette*, --- F.Supp.3d ----, No. MO:22-CR-00141-DC, 2022 WL 4476790, at *8 (W.D. Tex. Sept. 25, 2022); *United States v. Coombes*, --- F.Supp.3d ----, No. 22-CR-00189-GKF, 2022 WL 4367056, at *5–7 (N.D. Okla. Sept. 21, 2022); *United States v. Garrett*, --- F.Supp.3d ----, No. 18 CR 880, 2023 WL 157961 (N.D. Ill. Jan. 11, 2023); *United States v. Harper*, --- F.Supp.3d ----, No. CR21-4085, 2022 WL 4595060, at *2 (N.D. Iowa Sept. 30, 2022); *Hill*, 2022 WL 4361917, at *3; *United States v. Jordan*, --- F.Supp.3d ----, No. EP-22-CR-01140-DCG-1, 2023 WL 157789 (W.D. Tex. Jan. 11, 2023); *United States v. Minter*, --- F.Supp.3d ----, No. 3:22-CR-135, 2022 WL 10662252 (M.D. Pa. Oct. 18, 2022); *United States v. Price*, --- F.Supp.3d ----, No. 22-CR-00097, 2022 WL 6968457, at *8 (S.D.W. Va. Oct. 12, 2022); *United States v. Riley*, --- F. Supp.3d ----, No. 1:22-cr-163 (RDA), 2022 WL 7610264 (E.D. Va. Oct. 13, 2022); *United States v. Young*, --- F.Supp.3d ----, No. 22-054, 2022 WL 16829260 (W.D. Pa. Nov. 7, 2022); *but see Range v. Attorney General United States of America*, --- F.4th ----, No. 21-2835, 2023 WL 3833404, at *1–8 (3d Cir. June 6, 2023) (holding § 922(g)(1) unconstitutional as applied to petitioner with prior felony for welfare fraud because the Government failed to show a historical tradition of disarming similar individuals).